UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,

    Plaintiff,

v.      Case No. 13-C-927

ROBERT NARVETT and SHIELD
MANAGEMENT GROUP, INC.,

    Defendants.

**DECISION AND ORDER**

On August 16, 2013, the United States Security and Exhange Commission (SEC) commenced this action alleging that Defendants Robert Narvett and Shield Managment Group, Inc., a company owned and controlled by Narvett, (collectively "Narvett") knowingly engaged in a fraudulent investment scheme through the offer and sale of promissory notes to family, friends and others. The scheme orchestrated by Narvett was alleged to have violated Section 17 of the Securities Act, 15 U.S.C. § 77q and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and to have defrauded investors of over $746,000. The SEC seeks relief in the form of a permanent injunction, disgorgement of profits with interest, and a civil penalty.

The allegations of the complaint are uncontested. Even before the action was filed, Narvett had consented to the entry of an order permanently enjoining him from violating the securities laws referenced above. A partial judgment incorporating the permanent injunction against Narvett was entered on October 22, 2013. In a consent filed with the court, Narvett has agreed that he would not contest the allegations of the SEC's complaint and that they should be deemed true by the court.

The case is now before me on the SEC's motion for imposition of monetary relief in the form of disgorgement, prejudgment interest and civil penalty.

## I. DISGORGEMENT AND INTEREST

The SEC seeks disgorgement of $746,331.75 and prejudgment interest of $41,944.50. The SEC argues this disgorgement amount is reasonable because it reflects the actual amount of funds Narvett agrees he misappropriated as alleged in the complaint. The interest requested by the SEC is calculated using the "underpayment rate" used by the Internal Revenue Service, which has been held to be an "appropriate pre-judgment interest rate." *S.E.C. v. Koenig*, 532 F. Supp. 2d 987, 995 (N.D. Ill 2007). Only the interest rate is undisputed.

Narvett contends that the SEC's disgorgement figure is too high because it fails to credit him for $494,619.00 that was returned to investors in good faith. Narvett attests to each payment to investors and provides bank records supporting most of the payments. Narvett also argues that an additional $50,000 should be subtracted from the SEC's disgorgement amount because those funds constituted a discretionary personal loan from Narvett to his brother. Reducing the SEC's figure by these amounts, Narvett argues $201,712.75 is the appropriate amount for disgorgement, plus prejudgment interest based on that figure.

The SEC acknowledges that properly documented distributions to investors may decrease the amount of disgorgement in a given case. In this case, however, the SEC contends that Narvett's payments to investors should not be considered because they were not made in good faith. Instead, the SEC alleges that after Narvett became aware of its investigation and even after suit was filed, he solicited and obtained close to $460,000 through so-called personal loans in a transparent attempt

2

to evade the statutory authority and jurisdiction of the SEC. It was this money he used to repay some of the investors some of their money. The loans were structured so as to avoid SEC jurisdiction and the lenders explicitly acknowledged that before making the loans they were aware of Narvett's "ongoing legal developments" with the SEC. (Decl. of Norman H. Jones, Exs. 26-30.) In the SEC's view, Narvett was simply "robbing Peter to pay Paul." Because Narvett, by his own admission, is incapable of repaying the loans, the SEC claims he has simply "further[ed] his scheme by another means."

The SEC also argues Narvett cannot characterize the $50,000 as a personal loan from his brother because that amount was included in the more than $746,000 that Narvett agreed, for purposes of this motion, was raised by the fraudulent sale of securities as described in the complaint. Finally, the SEC argues Narvett has failed to provide sufficient documentation for all of the payments claimed to have been made to investors. Accordingly, the SEC states that if the court determines it is appropriate to credit Narvett for payments to investors, the appropriate disgorgement amount is $335,697.42, which is the $746,331.75 disgorgement amount, minus $410,634 in payments which are supported by bank records, with no credit for the purported $50,000 loan. Based on that figure, the appropriate prejudgment interest would be $18,886.50.

I agree with the SEC that Narvett cannot claim the $50,000 from his brother was a personal loan not subject to disgorgement, given that he agreed, for purposes of this motion, the allegations in the complaint are to be deemed to be true. The $50,000 is part of the SEC's disgorgement amount because it is part of the total funds raised as a part of the unlawful scheme described in the complaint. Having agreed that the court should deem the allegations of the complaint true, Narvett cannot now offer evidence in conflict with those facts. That Narvett's brother is willing to "write off" his

3

investment and spare him from the consequences of his crime is understandable and even commendable, but it does not change the fact that Narvett defrauded his brother of $50,000.

I also agree with the SEC that Narvett should not be credited for distributions to investors where there are no bank records supporting the transactions. The defendant bears the burden of proof regarding disgorgement and "the risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty." *SEC v. Alanar*, No. 05-C-1102, 2008 WL 1994854, at *4 (S.D. Ind. May 6, 2008). No explanation has been offered for why there are no bank records for these transactions, and given Narvett's invocation of his Fifth Amendment right to remain silent, the SEC is precluded from interviewing him about where the money came from and why there are no records of the transactions. Absent more, I cannot conclude that these payments actually reduced the amount of Narvett's ill-gotten gains.

I agree with Narvett, however, that he should be credited for the payments to investors for which they have provided supporting documentation showing payment out of accounts he owns or controls. "Disgorgement is an equitable remedy designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating the securities laws." *S.E.C. v. First City Financial Corp., Ltd.*, 890 F.2d 1215, 1230 (D.C. Cir. 1989). But disgorgement may not be used punitively. *Id.* at 1231. It is therefore essential that the SEC distinguish between legally and illegally obtained profits. *Id.* (citing *CFTC v. British Am. Commodity Options Corp.*, 788 F.2d 92, 93 (2d Cir.), *cert. denied*, 479 U.S. 853 (1986)). As Narvett notes, courts have logically considered the disgorgement amount in a case like this to be the total contribution from investors minus the distributions to

investors, since the distributions do not unjustly enrich the defendant. *See, e.g.*, *id.*; *SEC v. Invest Better 2001*, No. 01-C-11427 (S.D.N.Y. May 4, 2005) (calculating disgorgement in "Ponzi" scheme by subtracting total distributions from total contributions).

The SEC's assertion that Narvett has purposely circumvented its jurisdiction and simply furthered the fraud by another means is essentially an admission that, as far as the SEC is concerned, the personal loans Narvett obtained were not illegal. By substituting personal debt for a portion of the proceeds Narvett obtained as a result of his fraudulent scheme, he has reduced the amount of his ill-gotten gain and thereby the amount he should be required to disgorge. The fact that he appears incapable of repaying the loans does not make them illegal, assuming he made no false representations of fact. If he did make false representations in connection with the personal loan transactions, of course, Narvett may be liable for another series of fraudulent transactions, but that issue is not before me. Disgorgement is for illegal profits, and I cannot simply assume all the funds Narvett has raised since the complaint was filed were illegally procured. Accordingly, I find the appropriate disgorgement amount is $335,697.42 and the appropriate prejudgment interest, based on that figure and the parties' agreement as to the applicable rate, is $18,886.50.

## II. CIVIL PENALTIES

The last matter to be determined is the civil penalty. The statutes at issue provide similar provisions setting forth three tiers of monetary penalties for statutory violations. *See* 15 U.S.C. § 77t(d)(2); *id.* § 78u(d)(3)(B). Under these statutory schemes, the maximum civil penalty is "the gross amount of pecuniary gain to such defendant as a result of the violation" or a set statutory amount (which varies depending on the tier), whichever is greater. The amounts in the second and

third tier are authorized when certain aggravating circumstances exist, but here, the complaint alleges Narvett operated a fraudulent scheme that raised more than $746,000, which is greater than the statutory cap for a natural person under all three tiers. Accordingly, the maximum civil penalty for Narvett personally is $746,000 regardless of which tier applies.

Neither party has proposed a specific amount to be imposed as a monetary penalty, but the SEC seeks a more severe penalty based on Narvett's high degree of scienter, the fact that Narvett's conduct was not isolated and because Narvett has continued to raise funds since the commencement of this action, has opened new bank accounts in an apparent effort to thwart the SEC's money tracing efforts, has refused to admit wrongdoing and has refused to cooperate during the investigation. Narvett requests a more moderate penalty, given the good faith repayments to investors and Narvett's diminished financial situation.

Civil penalties are designed to punish the violator and deter future violations of securities laws. *Haligiannis*, 470 F. Supp. 2d at 386 (S.D.N.Y. 2007). To determine the appropriate amount to impose as a civil penalty, courts look to several factors, including:

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

*Id.* In this case, significant penalties are in order. Narvett's conduct was intentional. He has not admitted wrongdoing, and he has never explained his actions. Although the actual amount of losses incurred by the victims of Narvett's fraud remains to be seen, there is no question that his conduct created very substantial losses. Further, as noted by the SEC, the conduct at issue was not isolated, but involved recurrent Ponzi-like payments to investors while Narvett misappropriated investors'

funds for personal use. Finally, with respect to Narvett's contention that he is broke, the fact that he may be destitute is not necessarily reason to reduce the penalty. The SEC interprets the fact that Narvett is destitute as proof that Narvett's paying back investors by soliciting loans was not in good faith, and that he is a continuing threat to the public. Given the ongoing dishonest and egregious breach of trust displayed by Narvett and the substantial amounts of money he obtained, I find that Narvett's financial difficulties are not a strong reason to reduce the civil penalty.

Based on a careful consideration of the parties' arguments and the circumstances in this case, I will impose a civil penalty in the amount of $300,000, which is less than half of the total amount he raised in his fraudulent scheme and slightly less than the amount ordered disgorged. This amount takes into consideration the scope of the fraud, Narvett's willful and deceitful conduct, the ongoing nature of his scheme, and the need to deter others. It properly reflects the magnitude of his fraud.

### III. CONCLUSION AND ORDER FOR JUDGMENT

At the request of the SEC, the court previously granted its unopposed motion for entry of judgment enjoining the defendants from violating the Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), and Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a). Upon further consideration, I conclude judgment should not have been entered both because the case was not concluded at the time and because a permanent injunction directing the defendants simply to obey the law is inappropriate. *See E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 841–42 (7th Cir. 2013) (noting that "[a]n injunction

that does no more than order a defeated litigant to obey the law raises several concerns"). Accordingly, the judgment previously entered in this matter is vacated and the Clerk is directed to enter a new judgment providing that it is hereby adjudged and decreed that:

1. Defendants Robert Narvett and Shield Management Group, Inc., shall disgorge profits of $335,697.42 they received as a result of the fraudulent scheme that is the subject of this action.

2. The defendants shall also pay prejudgment interest on the disgorged profits in the amount of $18,886.50; and

3. The defendants shall pay a civil penalty in the amount of $300,000.

**SO ORDERED** this  14th  day of October, 2014.

     s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court